ROBERT H. McCARTER, attorney-general, complainant and respondent,

*v.*

VINELAND LIGHT AND POWER COMPANY, defendant and appellant.

[Argued December 9th, 1907. Decided June 22d, 1908.]

A purchaser at a receiver's sale, held pursuant to what is now section 82 of the General Corporation act (*P. L. 1896 p. 303*), of all the franchises of a gas company (including a franchise to lay gas pipes in the

streets), holds such franchises, in view of the act of February 17th, 1881 (*P. L. 1881 p. 33*), as a body politic and corporate and has no power as an individual to convey such franchises to another person; and, when a corporation, the lessee of the person to whom such franchises were attempted to be conveyed, and with no other right, proceeds to exercise such franchises by opening and occupying the streets, it will be restrained on the information of the attorney-general.

On appeal from an order of the court of chancery advised by Vice-Chancellor Leaming, whose conclusions are reported in *72 N. J. Eq.* (*2 Buch.*) *767.*

*Messrs. French & Richards,* for the appellant.

*Mr. Edwin F. Miller, Mr. Louis H. Miller* and *Messrs. Gaskill & Gaskill,* for the respondent.

The opinion of the court was delivered by

TRENCHARD, J.

This is an appeal from an order of the court of chancery granting a preliminary injunction.

The information seeks to restrain the Vineland Light and Power Company from extending its gas mains through the highways of the borough of Vineland and township of Landis.

The defendant company was incorporated in the year 1900 under the General Corporation act of this state (*P. L. 1896 p. 277*), having for its object, among others, as stated in its certificate of incorporation, the making, sale and distribution of gas in the borough of Vineland and the township of Landis.

No permission has been granted the defendant company by either of the municipalities named to open and occupy the highways. It claims the right to do so as lessee of the franchises granted by the legislature to the Vineland Gaslight Company, by act approved March 15th, 1870. *P. L. 1870 p. 577.* That act granted to the company last named the right to lay gas pipes in the highways now in dispute. The defendant company claims title to the franchise of the earlier company in the following manner: In the year 1884 the Vineland Gaslight Company became insolvent and a receiver was appointed by the court of chan-

cery. Pursuant to an order of the court the receiver made public sale of all the property and all the franchises belonging to the company and appertaining to the principal work for the construction whereof the company was incorporated, and John R. Farnum became the purchaser at that sale, which was duly confirmed by the court. Farnum operated the works until March 27th, 1900, when he and his wife conveyed the same to Arthur A. Holbrook. The conveyance included all the real and personal property purchased by Farnum at the receiver's sale and specifically included the franchises sold by the receiver to Farnum. On March 31st, 1900, Holbrook and his wife conveyed the same property, except the franchises, to the defendant company, and, by a separate instrument, leased the franchises to the defendant company for the term of ninety-nine years. Since that date the defendant has operated the works and has made some extensions. At the time the information was filed the defendant was engaged in making further extensions and the information was filed to enjoin this new work.

The learned vice-chancellor held that while the purchaser at the judicial sale acquired, under what is now section 82 of the General Corporation act (*P. L. 1896 p. 303*), all the property, rights, powers, privileges and franchises of the insolvent corporation, yet his title, possession and enjoyment were impaired or wholly destroyed by his failure to comply with the provisions of the act of February 17th, 1881 (*P. L. 1881 p. 33; Gen. Stat. p. 3694 §§ 34, 35*), by completing the organization of the company as authorized by that act.

While we have not found it necessary to decide that precise question, yet we are of the opinion that the preliminary injunction was properly granted for the reasons we will now state.

The rule must be considered settled that no person or corporation can acquire a right to make a special or exceptional use of a public highway, not common to all the citizens of the state, except by grant from the sovereign power. *Jersey City Gas Co.* v. *Dwight, 29 N. J. Eq. (2 Stew.) 242.*

We think the defendant company had acquired no right to make the extensions enjoined, because it had no grant from the state.

We have pointed out that it was organized under the General Corporation act and claims its right to use the streets as lessee of the franchises of the Vineland Gaslight Company, acquired by the latter company by *P. L. 1870 p. 577.*

Although, technically speaking, franchises are property, they are property of a peculiar character, arising only from legislative grant, and are not subject to sale and transfer without the authority of the legislature. *Stockton* v. *Central Railroad Co., 50 N. J. Eq.* (*5 Dick.*) *52; Randolph* v. *Larned, 27 N. J. Eq.* (*12 C. E. Gr.*) *557; Black* v. *Delaware and Raritan Canal Co., 22 N. J. Eq.* (*7 C. E. Gr.*) *130.*

We find no legislative authority for the conveyance of the franchises by Farnum to Holbrook, from the latter of whom the defendant claims title.

Section 82 of the General Corporation act (*P. L. 1896 p. 303*) provides:

"Whenever a receiver of a corporation shall have charge of a canal, railroad, turnpike or other work of a public nature, in which the value of the work is dependent upon the franchise, and in the continuance of which the public as well as the stockholders and creditors have an interest, the receiver may sell or lease the principal work for the construction whereof the said corporation was organized, together with all the chartered rights, privileges and franchises belonging to it and appertaining to such principal work; and the purchaser or purchasers, lessee or lessees of such principal work, chartered rights, privileges and franchises, shall thereafter hold, use and enjoy the same during the whole of the residue of the term limited in the charter of said corporation, or during the term in such lease specified, in as full and ample a manner as such corporations could or might have used and enjoyed the same; subject, however, to all the restrictions, limitations and conditions contained in such charter; *provided,* that nothing in this section contained shall be so construed as to apply to or in anywise affect any corporation authorized by law to exercise banking privileges."

This legislation, in substance, was originally enacted March 11th, 1842 (*P. L. 1842 p. 164*) and with minor changes has been preserved (*Rev. Stat. 1846 p. 136 tit. 5 ch. 3 § 20; Rev. p. 192 § 85; P. L. 1896 p. 303 § 82*), and is relied upon by the defendant to protect it in the enjoyment of the franchises originally granted to the Vineland Gaslight Company and sold by the receiver to Farnum.

The rights, if any, acquired by the defendant, are derived from the deed of Farnum to Holbrook, as affected by the provisions of the Corporation act and the independent statute of 1881, hereinafter particularly referred to, which establishes a mode of procedure when the property and franchises of a gas company are sold pursuant to a process or decree of the courts.

That act of February 17th, 1881 (*P. L. 1881 p. 33; Gen. Stat. p. 3694 §§ 34, 35*), in relation to the sale and reorganization of turnpike, gas and other companies, provides that upon the sale of the property, rights, powers, privileges and franchises of any turnpike or gas company under any process of decree of any court of this state, or of the circuit court of the United States—

"The person or persons for or on whose account such property, rights, powers, immunities, privileges and franchises may be purchased shall be and they are hereby constituted a body politic and corporate, and shall be and they are vested with all the rights, title, interest, property, possession, claim and demand in law and equity of, in and to such * * * company, with its appurtenances and with all the rights, powers, immunities, privileges and franchises of the corporation as whose the same may have been sold."

The act further provides that such persons, for or on whose account any such property, rights, powers, immunities, privileges and franchises of such corporation may or shall have been purchased, "may organize said new corporation, elect directors and officers, issue stock, create and issue preferred stock and issue and secure bonds."

We have pointed out that Farnum, in 1884, properly acquired title at the receiver's sale to the property of the Vineland Gaslight Company, including all the chartered franchises belonging to the Vineland Gaslight Company. Instead of availing himself of the provisions of the act of 1881, above referred to, Farnum continued to maintain and operate the gas works as an individual in his own name and as sole owner, until on or about March 27th, 1900, when he conveyed all the property and franchises which he had acquired at the receiver's sale to Holbrook, who, on the 31st of March, 1900, conveyed the property, real and personal, to the defendant company, a new corporation, just organ-

ized under the General Corporation act, and leased to the same company all the chartered franchises granted to the original Vineland Gaslight Company by the legislature.

It will be seen, therefore, that a construction of what is now section 82 of the General Corporation act, as modified by the act of 1881, is necessary to a determination of this case.

It is a rule of construction, well established, that all acts *in pari materia* are to be taken together as if they were one law. *Perth Amboy* v. *Piscataway, 19 N. J. Law (4 Harr.) 173; Jersey* v. *Demarest, 27 N. J. Eq. (12 C. E. Gr.) 301; Mickle* v. *Matlack, 17 N. J. Law (2 Harr.) 93; Newark City Bank* v. *Assessors, 30 N. J. Law (1 Vr.) 22.*

Construing the acts in question together, viz.: Eighty-two of the Corporation act and the act of 1881, we find a definite disposition of the title to the chartered rights, privileges and franchises of the insolvent corporation.

Under section 82 of the act concerning corporations, Farnum's rights as a purchaser would seem to be absolute. The title to the chartered rights, privileges and franchises of the corporation passed to the purchaser, who became entitled to hold, use and enjoy the same during the whole of the residue of the term limited in the charter of said corporation in as full and ample a manner as such corporation could or might have used and enjoyed the same, subject, however, to all the restrictions, limitations and conditions contained in such charter.

If this statute stood alone, Farnum might well claim that he acquired these franchises, although of a public nature, as an individual with the right of perpetual succession, analogous to an indefeasible estate in fee-simple of lands, including not only *jus in re* but *jus disponendi*. But in 1881 (*P. L. 1881 p. 33*), before Farnum's purchase at the receiver's sale, the legislature, in exercising control of gas companies and others, modified the character and conditions of the title of purchasers of public franchises at a judicial sale.

The state did not take away or abridge the rights and franchises acquired under the receiver's sale, but prescribed a mode of procedure whereby such rights and franchises, together with

the right of perpetual succession, should be thereafter held and enjoyed.

The legislative intent seems to be clear to create a new corporation and not to permit public franchises to pass to an individual to be used and enjoyed, sold and transferred, bequeathed and devised in the same manner as ordinary real or personal property.

Accordingly, the act of 1881 created a corporation in which the title to the franchises in question was *ipso facto* vested. The effect of this enactment is the same, whether or not the purchaser exercised his right to organize "the new corporation" already created by the election of directors and officers and the issue of stock and the securing of bonds. The act effectually transferred the title and the right of perpetual succession to a corporation sole, and the purchaser, as an individual, ceased to have any title which he could convey or lease in his lifetime or transmit by testamentary disposition.

It is quite probable that the legislature, in formulating the provisions of the act of 1881 concerning the sale and reorganization of turnpike, gas and other companies, used as a guide the act of March 25th, 1875, concerning the sale of railroads, canals, turnpikes, bridges and plank roads. *Rev. of 1877 p. 945.*

It is true that this court had before it for construction this latter act, in the case of *Boylan* v. *Kelly, 36 N. J. Eq. (9 Stew.) 331.* But it is a misapprehension of the language of that opinion to consider that it decided that the purchaser at a sale had under that act—or a person for whose account the purchase was made— was not by the express provision of the act made a body corporate. In the cited case, one Kelly was the purchaser. He conveyed to Boylan, who, "in due time, proceeded to effect a corporate organization," under the statute.

Chancellor Runyon, in the court below, *32 N. J. Eq. (5 Stew.) 581,* held that Boylan (the person on whose account the purchase was made), was by force of the statute, a body corporate. Whether the statute had this effect, or whether it permitted Boylan to hold as an individual, or as a corporation, as he might elect, was a question, the decision of which the case did not require. Certainly if it did not expressly make the purchaser a body corporate, it authorized him to hold as a corporation, if he

wished to do so, and that he did so wish was conclusively shown by his proceeding to effect a corporate organization under the act.

The question which the court of errors and appeals was called upon to determine was whether parties having judgments against Boylan personally could reach the property and franchises acquired by him through the sale made under the act of 1875. If he held them as an individual they were subject to levy under the judgments against him; if he held them in a corporate capacity, they were not.

Dealing with this question, the court uses this language: "The chancellor, following the case of *Commonwealth* v. *Central Passenger Railroad Co., 52 Pa. St. 506,* considered the act of purchase by Boylan as creating him a corporation under the statute. The act certainly does confer upon such purchaser the right, at his election, to take and hold and exercise such property and franchises in a corporate capacity, to the full measure in which they were enjoyed by the corporation sold out, with power to organize for its management in the usual mode of controlling such interests. The purchaser, Boylan, left it in no doubt as to the character in which his purchase was designed to be held, for he proceeded in due time to effect a corporate organization."

Nothing more than this is said by the court as to the meaning of the act. No declaration that the chancellor's construction is erroneous; no pointing out where the error lies; no citation of the language of the statute; nothing to suggest that the court differs with the chancellor, except the use of the word "certainly."

As we read the opinion of Mr. Justice Knapp, he says in effect that the act *at least* gives Boylan the right to become a corporation, and that right he has exercised; it is therefore not necessary for us to go as far as the chancellor, and say that under the statute his purchase made him a corporation *nolens volens.*

To hold that he meant anything more than this, is to say that he deliberately overrode what seems to us to be the plain declaration of the statute without a word of explanation by way of showing why that declaration was not to be accepted as it reads. The language of the statute is that

"The person or persons for or on whose account such railroad, canal, turnpike or plank road may be purchased, *shall* (be) *and are hereby constituted* a body politic and corporate."

It seems to us that the words could not be plainer. We should require something more than the words used by the learned justice in the cited case to convince us that he, and the other judges who sat with him, intended to declare that the word *"shall"* was not mandatory, but permissive only, and that the expression *"are hereby constituted a body politic and corporate"* did not create a corporation *in præsenti,* but merely conferred the privilege of becoming a corporation *in futuro,* should the purchaser or purchasers so desire.

It should be noted, also, that the act of 1881 differs from somewhat similar acts in New York and North Carolina, which have been discussed in leading cases and which confer the privilege of applying for a charter for a new corporation, but do not require the purchasers to form a corporation.

Accordingly, it was held in *People* v. *Brooklyn, Flatbush and Coney Island Railroad Co., 89 N. Y. 75,* that, although a purchaser at a foreclosure sale of a railroad was authorized to create a new corporation for the purposes of the transfer, it was not essential to do so, for he might transfer the property and franchises to a corporation already existing and capable under the law of its creation of holding the property and exercising the franchises which passed to the purchaser by the mortgage sale.

So, in the case of *Julian* v. *Central Trust Co., 193 U. S. 93,* the Railroad act of North Carolina was discussed, in a suit to enjoin a sale of property under execution against the Western North Carolina Railroad Company, the property and franchises of which had been sold under foreclosure and purchased by the Southern Railroad Company, a foreign corporation.

In support of the right to enforce the executions upon the judgments against the old company, it was claimed that unless the purchaser should, under the Railroad law of North Carolina, organize a new domestic corporation to take the place of the old one, the property continues liable, though in the hands of the purchaser, to claims and judgments against the old corporation.

The United States supreme court said: "It is true the sec-

tions of the North Carolina code herewith given clothe the pur-
chaser with the right and privilege of organizing a corporation
to operate the purchased property, but we find no requirement
that he shall do so."

After quoting the provisions of the act, which provides that
the purchasers may file articles of association and such pur-
chasers and associates shall thereupon become a new corporation,
the court continues: "This confers a privilege, but does not pre-
vent the purchaser from transferring the property to a company
already formed and authorized to purchase and operate a rail-
road."

The court therefore held that the judgments could not be
enforced against the Southern Railroad Company, and that the
purchaser at the foreclosure sale without re-incorporation had
the capacity to acquire the title to the property and franchises
free from the judgments against the former company.

The act of 1881 created a new corporation when the purchase
is consummated. There is, we think, no room for argument or
difference of opinion as to the meaning of the act.

The purchaser is constituted a body politic and corporate by
the express language of the act, and vested with all the property
of the company and all its rights, powers, immunities, privileges
and franchises.

Under the act of 1881, there is no option to the purchaser to
apply for a charter or not, as he pleases. There is no privilege
conferred upon the purchaser to accept or reject at his will.
The act itself confers the charter and creates the corporation,
which comes into existence at the completion of the purchase.
Whether the organization of the corporate body by election of
directors and officers is required may be in question, but the leg-
islative intent is unmistakable to prevent the anomaly of public
franchises passing by assignment or devolution by operation of
law or by last will and testament.

It is against the policy of the state to have public franchises
operated by individuals, by executors, administrators, guardians
of infants, or trustees in bankruptcy.

If the claim of Farnum to exercise the *jus disponendi* is sound,
and his title as an individual is absolute, the transfer of the

franchises to an alien or a foreign corporation might be sustained and the anomaly would be presented of public franchises operated in some parts of the state by individuals, in other parts by foreign corporations or foreign executors or trustees or assignees who claim title by purchase, and in still other parts by companies organized under laws regulating public service corporations.

The policy of uniform legislation must be adhered to and public corporations should be amenable to a fixed code of laws, regulating and controlling their operations and defining the duties and obligations of their officers and agents in the interest of the public.

A strict construction of similar legislation was made in *Snell* v. *City of Chicago, 152 U. S. 191,* where the president of a plank road company was authorized by statute to sell to the county of Cook the franchise, property and immunities of the company, or to any other party, and the right was exercised by the execution of a deed, conveying all the property of the company, consisting of the charter and its amendments and franchises, the right of way, grading, planking, ditches, bridges and drainages, toll houses, &c., to one Snell, who went into actual possession and control of the property and franchises and continued to exercise them until his death eighteen years later. The city of Chicago commenced proceedings to remove a toll gate maintained by the heirs of Snell, who thereupon filed a bill for an injunction. The court of Illinois dismissed the bill and the appeal was dismissed by the United States supreme court. While the supreme court did not expressly decide that the strict construction given by the court below was correct, and decided that no federal question was involved, yet the court said: "The mere grant of franchises to a corporation carries with it no power of alienation and many cases have arisen in which an attempted alienation by the corporation has been declared by the courts to be void, as divesting it of the power to discharge the duties imposed by the charter."

The supreme court of Illinois, in the same case below (*Snell* v. *Chicago, 133 Ill. 413*), declared that the person who was to enjoy the rights and privileges of the corporation was the purchaser of the franchise and road, and this did not include his

heirs and assigns. It was stated that at most Snell had merely the "right to organize as a corporation." The court used this language: "If Snell in his lifetime was the owner of such franchise by express legislative grant, he could not assign it, and it could not descend to his heirs. He failed to use it for the purpose of effecting any corporate organization and it died with him."

We point out that the act of March 24th, 1899, entitled "An act concerning corporations" (*P. L. 1899 p. 384*), has no application to the present case, for the reason that it only provides for a transfer of franchises by lease or assignment, by one corporation to another corporation, and does not refer to a conveyance by an individual to another individual, or to a lease by an individual to a corporation, such as are in the chain of title of the defendant.

It is a well settled rule that a corporation, created by statute, possesses no rights and can exercise no powers which are not expressly given or to be necessarily implied. *Stockton* v. *Central Railroad Co.,* 50 *N. J. Eq.* (*5 Dick.*) 52; *Northwestern Fertilizing Co.* v. *Hyde Park,* 97 *U. S. 659.*

In accordance with these principles, Farnum, the purchaser at the receiver's sale, held the franchise as a body politic and corporate and had no power as an individual to convey them to Holbrook. Since the defendant claims the franchises as the lessee of Holbrook, it follows that the defendant was not possessed of them.

This being so, there can be no doubt of the power of the court to restrain the act complained of at the instance of the attorney-general. *Stockton* v. *Central Railroad Co., 50 N. J. Eq. (5 Dick.)* 52.

The order of the court below granting the preliminary injunction is therefore affirmed, with costs.

PITNEY, CHANCELLOR.

My vote for affirmance is based substantially upon the grounds expressed by Vice-Chancellor Leaming in his opinion delivered in the court below, and reported in *65 Atl. Rep. 1041.*

SWAYZE, J. (dissenting).

The opinion of the court rests upon the view that the act of 1881 superseded section 85 of the General Corporation act of 1875 (*Rev. p. 192*) so far as it was applicable. I think differently. The act of 1881 was modeled after section 1 of an act concerning the sale of railroads, canals, turnpikes, bridges and plank roads, approved March 25th, 1875. *P. L. 1875 p. 41.* It follows that act so closely in its essential features that it was evidently copied therefrom. Prior to the sale of the gas works of the old Vineland company, the act of 1875 had been before this court in *Boylan* v. *Kelly, 36 N. J. Eq. (9 Stew.) 331.* In that case (at *p. 335*), we referred to the opinion of Chancellor Runyon that the act of purchase constituted the purchaser a corporation, but did not approve of that opinion which would have been decisive of the case. On the contrary, we distinctly said that the act conferred upon the purchaser the right, at his election, to take and hold and exercise the property and franchises in a corporate capacity, and we pointed out that the conduct of the purchaser in that case sufficiently evinced his purpose to receive and hold the property and rights in a corporate relation, and not as a natural person. The reasoning of this court was quite unnecessary if the view of the majority in the present case is correct. The fact that we decided the *Boylan Case* upon the ground that the purchaser had evinced an election to hold as a corporation, and not as a natural person, amounted to a disapproval of the view expressed by Chancellor Runyon and now adopted by us. With that decision upon a similar statute, Farnum evinced his election to take as a natural person under section 85 of the Corporation act. All the orders of court and the conveyance to him are couched in language taken from that section. He had a right to rely on what we said in the *Boylan Case,* and it is too late for us, after property rights have been acquired in reliance upon that ruling, to change our position. When the legislature in 1896 revised the Corporation act it had before it not only the act of 1881, but the act of 1875, and it then re-enacted section 85 as section 82 (*P. L. 1896 p. 303*), and repealed all inconsistent acts. Section 82 of the act of 1896 mentions by name railroads, canals and turnpikes, so that it cannot

be said that the legislature did not have in mind the very classes of corporations mentioned in the acts of 1875 and 1881. I do not think these acts were repealed by the act of 1896, for the reason that I think there is no necessary inconsistency. The re-enactment of section 85 by the legislature is an indication that the revisers, experts as they were in our corporation law, were of opinion that it had not been superseded either by the Railroad and Canal act of 1875 or the so-called Turnpike act of 1881; and the legislature adopted that view, which was the same view expressed by us in the *Boylan Case.*

The object of section 85 was not the advantage of the corporation or its creditors. It was to preserve for the benefit of the public the right to continue the operations of corporations having charge of a work of a public nature in which the value of the work was dependent upon the franchise, and in the continuance of which the public, as well as the corporators and creditors of the company, had an interest. The legislature recognized the fact that there was a public interest to be served by the continuance of the operations of the company, and that this end could not be accomplished if the physical property was to be severed from the right to use and operate the same. The present case illustrates the difficulty. It follows logically from the view of the court that the present defendant is without power to conduct the business of supplying Vineland with gas, and, since Farnum has died without organizing a corporation under the act of 1881, no one has the legal right to supply this important municipality with one of the necessities of modern life.

My view, I think, harmonizes with other well-established legal principles. Before a corporation can actually exist there must not only be a charter, but an acceptance of that charter. Farnum, instead of accepting the corporate powers conferred by the act of 1881, did all in his power to show that he did not accept them. By our present decision the purchaser becomes a corporation *nolens volens,* and is at once, by the act of purchase, constituted a corporation sole—a corporation quite anomalous in our law. Upon this anomaly is ingrafted another, for the corporation sole is empowered by the act to organize "said new corporation" by the election of officers and directors, the issuing of certificates

of stock, and the creation of preferred stock. A corporation sole with attributes of this character is a legal novelty; yet what other view can be taken? The words "said new corporation" point necessarily to the former language of the section, which, the opinion holds, create a corporation sole. The only other view possible is that the corporation sole created by the mere act of purchase can at once proceed to convert itself into a corporation aggregate, a legal novelty hardly less striking than the former. These difficulties are enough to lead me to conclude that we took the correct view in *Boylan* v. *Kelly,* that the purchaser does not become a corporation by the mere act of purchase, but has his election to hold as an individual or to organize a corporation aggregate under the act of 1881.

There is no insuperable difficulty in an individual exercising such franchises as those now in question. He must have express legislative authority, but that is given by section 85 of the old Corporation act. The charter of the old Vineland company gave it express authority to borrow money upon a mortgage of its lands, works, property and franchises. At the date of the charter, and for many years thereafter, such mortgages were usually given to individuals, and the mortgage upon the franchises or even upon the property could be of little value to the mortgagee, unless in case of foreclosure he might purchase the mortgaged property and exercise the franchises. *New Orleans, &c., Railroad Co.* v. *Delamore, 114 U. S. 501; 5 Sup. Ct. 1009; 29 L. Ed. 244.* The franchise to maintain and operate the works may be exercised by natural persons. *Memphis, &c., Railroad Co.* v. *Berry, 112 U. S. 609; 5 Sup. Ct. 299; 28 L. Ed. 831.* Our statute is careful to define the right acquired by the purchaser. It is the right to exercise the franchise "during the whole of the residue of the term limited in the charter of said company." In this respect the case differs from *Snell* v. *Chicago, 133 Ill. 413; 24 N. E. Rep. 532; 8 L. R. A. 858,* and on appeal, *152 U. S. 191; 14 Sup. Ct. 489; 38 L. Ed. 408.* The term limited in the charter of the Vineland company was perpetual, and a right to exercise the franchises for the whole of the residue of the term necessarily includes a right which shall

outlast the life of a natural person, and, to be available at all, must therefore involve the right to convey. In the absence of legislation forbidding the exercise of such a franchise by a natural person as grantee, I see no reason why one natural person who is by statute authorized to exercise the franchises may not convey them with the works to another natural person. This was done in the case of *Boylan* v. *Kelly*.

I do not question the power of the legislature to control within the constitutional limits the business of supplying gas to a municipality. Section 85 of the Corporation act of 1875 itself enacts that the purchaser shall hold, use, and enjoy the franchises subject to all the restrictions, limitations, and conditions contained in the charter of the insolvent company, and no doubt this would authorize any regulations of the exercise of the rights by Farnum or his grantees which might have been made with reference to their exercise by the Vineland Gaslight Company.

I do not understand whether the court holds that the franchises conveyed to Farnum ceased with his death, or whether they are still in existence. The reference to *Snell* v. *Chicago* seems to indicate that the court favors the former alternative. If that view is correct, the effort of the legislature, both by section 85 of the Corporation act of 1875 and by the act of 1881, to preserve these franchises for the public benefit was singularly inefficacious, since it was made to depend upon the uncertain tenure of the purchaser's life.

If these franchises are still subsisting, they must have passed as property of a corporation sole, since the opinion clearly indicates that they could not pass by will or intestacy. If that view is correct it is of considerable importance to know in whom they are now vested. Whoever it may be, it would seem that he holds the franchises separate from the physical property, the works, gas holder, pipes, &c., and no one is at present authorized by law to supply this municipality with gas.

I prefer the more simple but less novel view which I have already indicated.

BOGERT and GREEN, J.J., concur in the views herein expressed.

GARRISON, J. (dissenting).

If it be conceded that the Vineland Light and Power Company is mistaken in its contention that it is the legal owner of the franchises of the Vineland Gaslight Company under color of which it has been and still is rendering the public service for which that company was incorporated, I am of opinion that the temporary opening of a street in the performance of that supposed duty and in the public interest is not such an irreparable injury or such a public nuisance as presents a proper case for interference by a court of equity.

"If a mistake has been made by the company," said Chancellor Vroom in *Attorney-General* v. *Stevens, 1 N. J. Eq. (Sax.) 369–385; 22 Am. Dec. 526,* "acting without fraud or corrupt intent but seeking to comply with the requisitions of law, it does not present a proper case for the interference of this court by the extraordinary remedy of injunction."

In *Morris and Essex Railroad Co.* v. *Attorney-General, 20 N. J. Eq. (5 C. E. Gr.) 530,* the chancellor had held that the defendants were not authorized to lay their track upon the street, and granted the injunction applied for by the information. Upon appeal this was reversed. Justice Depue, in delivering the opinion of this court, said: "It must not be overlooked that the defendants are engaged in a public work, by the completion of which the public interests will be greatly advanced. The injunction by which the progress of the work is arrested must not only cause great injury to the defendants, but also is the occasion of great inconvenience to the public."

In the case of *Allen* v. *Freeholders of Monmouth County, 13 N. J. Eq. (2 Beas.) 68,* it was held "that, although a bridge which was being erected over navigable waters without competent authority was technically a nuisance, yet as it was being built in good faith, and for the public benefit, a court of equity would not restrain its erection even on an information by the attorney-general in behalf of the public." *Morris and Essex Railroad Co.* v. *Attorney-General, 20 N. J. Eq. (5 C. E. Gr.) 530.*

In *Attorney-General* v. *Delaware and Bound Brook Railroad Co.* the court said: "There is still another consideration con-

straining me to the conclusion at which I have arrived. The defendants have acted *bona fide* under what they believed to be sufficient legislative authority. They have expended a very large sum of money in their enterprise. * * * The defendants have been permitted to make their immense expenditure upon their enterprise in the confidence of their convictions that they possessed all requisite legislative authority without even a word of protest or remonstrance. Under such circumstances, equity will refuse to aid even to the state, leaving it to its remedy at law." *Attorney-General* v. *Delaware and Bound Brook Railroad Co., 27 N. J. Eq. (12 C. E. Gr.) 1.*

Conformity to the views thus expressed by chancellors and by equity judges in this court requires that we reverse the decree in the present case, which more than any of those cited is inopportune for interference by the injunction power of the court of chancery. The statute that granted the charter of the original gas company was enacted in the interest of the public. The statutes that were enacted to prevent the lapsing of these public service franchises had the same interest in view. The new corporations that were authorized and capacitated to continue such franchises were conceived in the same spirit. The present corporation is in form and effect identically such a corporation. The technical flaw in its mode of organization is technical merely, and does not appeal to a court of equity. The only matter we are asked to decide is a sharp legal point about which, if mistake was made, it was made upon the advice of conscientious and eminent counsel years ago, and now raises after acquiescence, expenditure of money and years of acceptable performance of a public duty.

The overt act with which the defendant is charged at this late day is that of continuing to serve the public interests that all the statutes referred to were enacted to subserve. In its most heinous aspect the defendant's defence consists in opening up the soil of the highway to lay a gas pipe—a matter of a few inches in point of depth and of a few hours in point of time, by which no substantial injury to the public is done, and by which no member of the public is even pretended to be injured. On the other hand, the injunction we are asked to approve will be a

grievous hardship to the very public in whose name alone it is or can be demanded. Its effect will be to deprive an entire community of a convenience of modern life necessary to its comfort, and all but essential to its safety. This must be the result of our decision, unless indeed there be a business competitor of the defendant waiting to avail itself of our decision of the sharp legal point involved. The case does not show that there is such a competitor, hence we are not to assume that there is; but, if there is, it does not constitute a public in whose interest we should disregard the interests of the real public, and depart from the salutary and well-considered declarations with which this memorandum is prefaced. The case is peculiarly one where a court of equity should decline to interfere.

*For affirmance*—THE CHANCELLOR, CHIEF-JUSTICE, REED, TRENCHARD, BERGEN, VREDENBURGH, VROOM, GRAY, DILL—9.

*For reversal*—GARRISON, SWAYZE, BOGERT, GREEN—4.